**UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY**

Caption in Compliance with D.N.J. LBR 9004-2(c)

Greenbaum, Rowe, Smith & Davis LLP
Metro Corporate Campus One
P.O. Box 5600
Woodbridge, New Jersey 07095
(732) 549-5600
Proposed Attorneys for the Debtor
David L. Bruck, Esq.

In re:

**SOUTHWARK FARM, LLC,
d/b/a BLACK RIVER FARM,**

Debtor.

Chapter 11 Proceeding

**Case No.: 11-26762**

## CERTIFICATION OF AMY JORGENSEN IN SUPPORT OF
## DEBTOR'S CHAPTER 11 PETITION AND FIRST DAY MOTIONS

I, **AMY JORGENSEN**, do hereby certify, under penalty of perjury, that:

1. Southwark Farm, LLC (the "Debtor") owns an equestrian farm located on approximately sixty-five acres of land located in East Amwell Township, Hunterdon County, New Jersey (the "Farm"). The Farm provides boarding[1], training and medical care for the horses owned by customers at the Farm; and in addition, Evan O'Donnell provides lessons to customers interested in learning horseback riding including jumping, showing and hunting. The Farm consists of several barns, arenas, both indoors and outdoors, a primary residential dwelling in which I live, and an outdoor grass grand prix field used for horse shows throughout the year. A detailed description of the Farm is annexed hereto as EXHIBIT A.

2. The Farm was purchased by myself, my father, Theodore Jorgensen, and Evan O'Donnell in 1997. We worked diligently to improve the Farm and build its

---

[1] Included within the term "boarding" is feeding, blanketing, exercising, cleaning, grooming, bathing and providing medicine to horses.

1306749.01

reputation as a credible equestrian farm providing a full range of services to its clients and customers.

3. In 2006, a fire swept through the Farm and destroyed a significant portion of the barns and killed several horses. The cause of the fire remains a mystery to this date.

4. Since 2006, we worked to rebuild the Farm and return it to financial viability. We did so through hard work and commitment and without any real assistance from our bank, Grand Bank, or from insurance proceeds.

5. In 2007, we obtained financing from Grand Bank in two pieces, a loan in the approximate amount of $3 million and another in the amount of $75,000. Notwithstanding our efforts, the cost of rebuilding the Farm was too great and the mortgage fell into default in October 2009 when we missed a monthly payment and real estate taxes fell into arrears; and soon thereafter, Grand Bank filed a foreclosure action and sought the appointment of a Receiver. On June 25, 2010, the Receiver was appointed as a "rent receiver" and has since that date overseen the operation of the Farm, collected the revenues pertaining to the apartment rentals, boarding and care agreements and shows held at the Farm and controlled the payment to vendors of the Farm. The Receiver's payment of vendors has been slow and inconsistent. As a result of the Receiver's refusal to pay ordinary business expenses, the Farm's accounts payable increased and its relationships with its vendors deteriorated. To this date, the Receiver refuses to pay certain ordinary expenses or delays the payment without visible cause.

6. On May 10, 2011, I received, through counsel, a letter from the Receiver, a copy of which is annexed as EXHIBIT B, advising that the Receiver demanded that

1306749.01

we leave the Farm or, if we refused to leave, that he would seek to evict us. The Farm is our home and our livelihood.

7. The dispute with the Receiver arises, in large part, from his demand that we turn over to the Receiver not only the monies collected from the apartments, from clients for boarding and care of horses at the Farm and generated by horse shows held at the Farm, but that, in addition, we turn over monies which Evan and I earn from training horses, giving lessons and from selling horses owned by clients for which we receive a commission. These monies are the only way that we have of paying our living expenses and we believe that these monies are not pledged to Grand Bank. Given the fact that the Receiver never agreed to pay Evan and I a salary, we did not turn over the monies that we earn from providing these services since to do so, would have left us without the ability to pay for our daily living expenses. We do not believe that the Court Order appointing the Receiver authorizes him to collect these monies since they are derived not from the Property, but from personal services provided by us. The Order appointing the Receiver says that he is a "rent receiver."

8. The within Chapter 11 has been filed in an effort to remove the Receiver, restructure the debts encumbering the Farm, preserve the equity in the Farm for the benefit of all creditors as well as ourselves and emerge from Chapter 11 with a Plan of Reorganization in place. I believe that removal of the Receiver is critical to the Farm's success and the return of the Farm to financial viability. With the Receiver in place, the Farm has lost credibility with its vendors and a loss of reputation in the equestrian community. It is our hope that without the Receiver, the Farm will regain its reputation. The Receiver's method of overseeing the Farm's operation has been confusing at best and ultimately prejudicial to the Farm. He operates through an assistant hired by Grand

Bank who comes to the Farm almost daily and at all hours of the day and night ostensibly for the purpose of picking up checks and bills, but whose presence annoys customers and clients, and interferes with the operation of the Farm as well as our daily life. She constantly loses checks and bills and creates crises that are unnecessary. Despite requests to replace the assistant with someone more knowledgeable and business-like, neither the Receiver nor Grand Bank has been willing to do so.

9. The money generated by the operation of the Farm comes from a variety of sources including the boarding and care of horses, training and lessons, horse shows and rental from six (6) apartments at the Farm. In 2008, the gross revenues generated by the Farm were $919,000. In 2009, the gross revenues generated by the Farm were $619,000. In 2010, the gross revenues generated by the Farm were $678,000. On an annual basis, the apartment leases generate approximately $80,700. For 2011, year to April 30, 2011, gross revenues are approximately $106,238 and the apartment revenues are $6,725 per month.

10. Boarding and care of horses at the Farm is for a basic boarding fee and includes daily feeding and water, stall cleaning and turning the horse out to pasture and other services necessary to maintain and keep the horses healthy and well fed. Training Board includes basic boarding plus daily grooming, exercise and tack cleaning. A copy of the Farm's Boarding and Care Agreement is annexed as <u>EXHIBIT C</u>. Typically, the basic boarding agreement requires a payment of $850 per month per horse which includes the basic boarding services. Training Board is $2,000 per month including the extra services. Additional services including training, lessons, breeding, etc. are provided for additional fees.

11.     Presently, the six (6) apartments at the Farm are leased to tenants who pay between $750 and $1,400 per month. A rent roll of the tenants on an apartment by apartment basis is annexed as EXHIBIT D.

12.     Annexed as EXHIBIT E is a pro forma income and expense statement for the year 2010. For 2011, the income and expenses has remained similar to those 2010. Annexed as EXHIBIT F is a three-month projection of income and expenses for the months of June, July and August 2011. The income reflected in the projections is inclusive of all income generated at the Farm and from the services provided by Evan and myself including boarding, training, lessons and apartment rentals. The expenses include a line item for salaries payable to Evan O'Donnell and myself, in lieu of the income that we would otherwise receive from the training of horses and lessons. In order to commit to and help the financial viability of the Farm for the purposes of Chapter 11, Evan and I have agreed that our personal income from the services we provide will be received by the Farm and in exchange we will receive a salary.

13.     In addition to myself and Evan O'Donnell, the Farm employs 4 employees including 3 full time and 1 part time employee. The aggregate cost of these employees, other than Evan and myself, is $5,000 per month. The $5,000 per month appears as a line item for "Labor".

14.     Included in the projections is a line item for estimated professional fees at $15,000 per month. I understand that professional fees are as allowed by the Court; however, the projections provide for a reserve of $15,000 per month so as to assure that the administrative expenses of the Chapter 11 are addressed.

15.     Grand Bank holds a mortgage lien encumbering the real estate owned by the Farm as well as a security agreement and financing statements encumbering all of

the machinery and equipment listed in the schedules. Certain pieces of equipment and certain horses are owned by Evan O'Donnell and myself and are not included in the Petition. In as much as we are prepared, for the purpose of the Chapter 11, to direct all revenues generated by lessons and training to the Farm rather than ourselves in order to maintain the financial viability of the Farm, there is no other source of funding of the operating expenses. Without the use of these revenues to operate the Farm, the Farm would have to be closed.

16. The Budget annexed as Exhibit F sets forth the normal monthly operating expenses of the Farm. It is essential that these expenses be paid on a current basis in order to maintain the Farm's viability and preserve and protect the equity in the Farm for the benefit of all creditors.

17. Grand Bank obtained an appraisal in 2009 (the "Appraisal"). The Appraisal is attached as <u>EXHIBIT G</u>. The appraised value of the Farm as set forth in the Appraisal is $5.4 million, nearly $2 million in excess of Grand Bank's debt; accordingly, there is sufficient equity in the Farm to provide adequate protection to Grand Bank for the use of the cash collateral generated by the Farm for the payment of its operating expenses thereby preserving its going concern value.

18. If we are permitted to use the revenues generated by the Farm to pay its normal operating expenses, we will be able to file a viable plan of reorganization for the benefit of the bankruptcy estate and all creditors.

## First Day Motions

19. I have formed opinions as to (a) the necessity of obtaining the relief sought by the Debtor in its first-day applications and motions described herein (collectively referred to as the "First Day Pleadings"), (b) the need for the Debtor to

-6-

1306749.01

continue to effectively operate, (c) the deleterious effects if the Debtor does not obtain the requested relief, and (d) the immediate and irreparable harm that the Debtors will be exposed to in the event that the Court does not approve the relief requested in the First Day Pleadings. My opinions are based upon my first-hand experience and through my review of various materials and information, and discussions with the others.

20. This Certification is submitted in support of the Debtor's voluntary petition and the First Day Pleadings.

21. I reviewed each of the First Day Pleadings and participated in the preparation thereof. I believe, to the best of my knowledge, that the facts set forth in the voluntary petitions and the First Day Pleadings are true and correct. This representation is based upon information and belief and through my review of various materials and information, as well as my experience and knowledge of the Debtor's operations and financial condition. Based upon the foregoing, if called to testify, I could and would, testify competently to the facts set forth in each of the First Day Pleadings.

22. The relief sought in the First Day Pleadings will minimize the adverse impact of this case on the Debtor and will maximize value for the Debtor's creditors. I believe that the relief sought in the First Day Pleadings is necessary to enable the Debtor to operate effectively as a Chapter 11 debtor-in-possession.

23. As described more fully below, the Debtor carefully tailored the relief requested in the First Day Pleadings in consultation with its professionals to ensure that the Debtor's immediate operational needs are met and that the Debtor will not suffer any immediate and irreparable harm. I personally participated in the analysis that led to the creation of each of the First Day Pleadings. The relief requested is narrowly tailored to

address those issues that require urgent relief to sustain the Debtor's immediate needs to function efficiently and without jeopardizing its operations.

### Motion for Authority to Pay Certain Pre-Petition Critical Vendors

24. One of the First Day Motions is a Motion to permit the Farm to pay certain critical vendors (the "Critical Vendors") their pre-petition claims. The Receiver refused to pay certain vendors' claims including the hay vendor (Outlaw Farm) and others. As a result, the account payable to Outlaw Farm is substantial. Outlaw Farm provides quality, fresh hay at a fair price which is critical to the Farm's operation. Without payment of these Critical Vendor claims, we will not be able to operate as efficiently as we have been able to do and the Farm's financial viability will be jeopardized. The maximum amount sought to be paid to the Critical Vendors is $50,000. We seek to pay this amount over an extended period on a monthly basis provided the critical vendors continue to supply the Farm.

25. The Debtor believes that payment of the claims of those vendors and service providers that the Debtor deems to be Critical Vendors is not only critical to the Debtor's reorganization efforts, but necessary in light of the industry in which the Debtor operates.

26. The Critical Vendors are the suppliers of products and services which are unique to the equestrian community and which are essential to the Debtor's ability to continue operating from day-to-day. The Debtor believes that the failure to pay and/or assure the obligations to pay certain claims of Critical Vendors would, in the Debtor's business judgment, result in the Critical Vendors refusing to provide goods or services to the Debtor post-petition, which would have an immediate and adverse effect on the Debtor's ability to operate its business. Moreover, the delay attendant to the Debtor's

-8-

changing from a Critical Vendor to another vendor of similar products or services (assuming one could be located within the vicinity of the Farm) would very likely delay the Debtor's ability to operate its business, which would be devastating to the Debtor's operation.

27. The Debtor has examined (and continues to examine) whether the payment of Critical Vendor claims is necessary, will ameliorate immediate and irreparable harm to the Debtor's business operation and will ensure that the Debtor has access to adequate trade credit post-petition. Specifically, the Debtor has undertaken a thorough review of its accounts payable and its list of pre-petition vendors to identify those vendors who are essential to the Debtor's operation.

28. The Debtor has developed certain procedures (for which it seeks this Court's approval) that, when implemented, will ensure that the Debtor derives value for payments to Critical Vendors such that vendors receiving payment of Critical Vendor Claims will continue to supply goods and services necessary to the Debtor's continued post-petition operation.

29. In estimating the Critical Vendor Claims the Debtor seeks authority to pay pursuant to this Motion, the Debtor will identify those vendors that are most essential to the Debtor's operation, using the following criteria: (a) whether the vendor in question is a "sole-source" or "limited source" provider, (b) whether the Debtor receives advantageous pricing or other terms from a vendor such that replacing the vendor post-petition would result in significantly higher costs to the Debtor and/or inadequate or unsatisfactory services, and (c) the overall impact on the Debtor's operation if the particular Critical Vendor ceased or delayed shipments or services.

30. After evaluating the information received in response to these inquiries, the Debtor estimated the total payments or assurances that would be necessary to ensure the continued supply of critical goods and services to the Debtor and, further, considered the Debtor's urgent need to continue to receive goods and services uninterrupted, its ability to find alternate sources, or satisfactory alternate services.

31. If the Debtor is unable to pay its Critical Vendors in accordance with the terms to be negotiated and those vendors cease or delay delivery of those goods or services for even one day, the Debtor could not operate its businesses. Without a full supply of these goods and services, the Debtor would be extremely disadvantaged and would suffer an immediate erosion in customer, creditor and employee trust and confidence which would be difficult, if not impossible, to restore.

### Cash Collateral Motion

32. The Debtor has an immediate need to use cash to facilitate, among other things, (a) the orderly continuation of the operation of its businesses until it can reorganize in Chapter 11 or sell its assets, (b) the management and preservation of Debtor's assets and properties, (c) the maintenance of business relationships with vendors, suppliers and customers, (d) payment of payroll obligations, (e) the satisfaction of other working capital and operational needs and (f) the maintenance of the going concern value of the Debtor's estate. Without authority to use cash, the Debtor lacks sufficient liquidity to preserve and maintain the going concern value of the Debtor during this Chapter 11 case and its estate will be irreparably harmed.

33. As of the Petition Date, Grand Bank asserts that it is owed approximately $3.4 million under its loans to the Debtor, which claims are secured by liens on the real

1306749.01

and personal assets of the Debtor and are guaranteed by myself, Evan and my father, Ted Jorgensen.

34.    By way of the motion, the Debtor seeks entry of an order authorizing the Debtor to use the Cash Collateral of Grand Bank. Debtor proposes giving Grand Bank a replacement lien on the post-petition assets to the extent of any diminution in value.

35. The ninety (90) day budget submitted in connection with the Cash Collateral Motion is accurate based upon my review of the operations of the Debtor.

I certify under penalty of perjury that the foregoing is true and correct based upon my knowledge, information and belief as set forth in this Certification.

_____
Amy E. Jorgensen

**Dated: May ___, 2011**

1306749.01